LEO MANZOLI AND MARY ANN MANZOLI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Manzoli v. Commissioner
Docket No. 47848-86.
United States Tax Court
T.C. Memo 1988-299; 1988 Tax Ct. Memo LEXIS 344; 55 T.C.M. (CCH) 1259; T.C.M. (RIA) 88299; July 18, 1988. John M. Doukas, for the petitioners. Charles W. Maurer, Jr., for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies of $ 19,093.00 and $ 189,343.68 in petitioners' Federal income tax for 1977 and 1978, respectively, and additions to tax under section 6653(b)[1] of $ 9,546.50 and $ 134,463.50 [2] for those years, respectively. The issue for determination are (1) whether petitioners understated their taxable income for 1977 and 1978, and (2) whether any part of any underpayment of tax for those years was due to fraud. *345 FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. Petitioners Leo and Mary Ann Manzoli (individually, Mr. Manzoli and Mrs. Manzoli) were born April 13, 1939, and October 12, 1940, respective, in Boston, Massachusetts, and were married in 1967. When the petition was filed, petitioners resided in Lynnfield, Massachusetts. Prior to the years in issue, Mr. Manzoli and Mrs. Manzoli each had long records of employment. Although neither earned a substantial annual income during this period, they lived frugally before and after marriage and saved money from earnings, gifts, and other sources. Mrs. Manzoli was employed first as a secretary while attending high school and college, earning about $ 2.00 per hour. Upon graduation from college in 1962 with a degree in education, Mrs. Manzoli was employed as a teacher in the public schools of Medford, Massachusetts. She continued to work in this capacity through 1976, although her employment continued into 1977 by use of extensive sick leave. Mr. Manzoli held or was engaged in a series of jobs or income-producing activities during this *346 period. From 1956 to 1958 Mr. Manzoli served in the United States Air Force, during which time he completed a high school equivalency program. From 1958 through 1965, Mr. Manzoli held various sales positions with retail shoe stores in the Boston area, never earning more than $ 100 per week plus commissions. From 1966 through 1972, Mr. Manzoli sold dental prosthetics for a dental supply company. During 1972 and 1973 Mr. Manzoli was a self-employed salesman of life and disability insurance. During 1973 Mr. Manzoli and James Tringali (Tringali), an uncle of Mrs. Manzoli and operator of a chain of fast-food restaurants in Florida under the name "Clock Restaurants," made plans to establish and operate a Clock Restaurant in Doraville, Georgia. Mr. Manzoli thus closed his insurance business and moved to Georgia to assist in the development of the restaurant, including the purchase of commercial real estate and the construction of the facility. On September 27, 1973, Mr. Manzoli and Tringali made an offer to purchase certain commercial real estate in Doraville for $ 120,000. While in Georgia, Mr. Manzoli applied for a loan with the First National Bank of Atlanta, submitting a Personal *347 Financial Statement dated November 7, 1973. The financial statement showed assets and liabilities of petitioners as follows: Assets
Cash on hand, and unrestricted in banks     $ 55,000 Bank Accounts       Noddle Island         Credit Union           $ 20,000
Boston Five Cents         Savings           4,000
Boston Federal Savings         5,000
Other Cash         26,000
Cash Surrender Value of Life Insurance     2,000
Stocks and Bonds, listed on NYSE     48,000
Other Stocks and Bonds     20,000
Real Estate     125,000
Automobiles     8,000
Fixtures and Equipment     20,000
Total Assets
$ 278,000
Liabilities
Notes Payable to Banks, Unsecured     University Trust Co.       $ 6,000  Taxes and Assessments Payable     2,500
The real estate shown on the financial statement is the Doraville property which Tringali and Mr. Manzoli had offered to purchase for $ 120,000. The full value of the property was listed although Mr. Manzoli ultimately acquired only a part interest. *348 The stocks and bonds shown on the financial statement were purchased with cash that petitioners had saved or received up to that time and with profits from trading securities. After purchasing the Doraville property in March 1974, Tringali, Mr. Manzoli and Robert Corvi, Mrs. Manzoli's brother-in-law, developed the Clock Restaurant as planned. The restaurant opened in May 1974, managed by Mr. Manzoli. The restaurant's business quickly proved disappointing. Later in 1974, Mr. Manzoli resigned as manager, returned to Stoneham, Massachusetts, and resumed the business of selling insurance. On January 1, 1975, Clock Restaurants, Inc., purchased the interest of Mr. Manzoli for $ 38,500, which was paid by cash of $ 3,500 and 13-percent note for $ 35,000. The note required 81 monthly payments of $ 672.69. On November 17, 1975, petitioners purchased land in Lynnfield, Massachusetts, on which to build a residence. The property was purchased with a $ 30,000 loan from Mrs. Manzoli's father, James Spinale (Spinale). Following the purchase of the property, Mr. Manzoli took a year off from his insurance business to construct the residence. Excavation began on March 17, 1976. Mr. Manzoli *349 either contracted the work or performed the construction work himself. Petitioners obtained a bank mortgage for $ 65,000. The two-story house had approximately 3,800 square feet on the ground floor. The house had a foyer, living room, dining room, family room, three bedrooms, three bathrooms including a master bathroom with a marble tub, a library/billiard room, a kitchen with an attached dining area, an office, an attached two-car garage, and a swimming pool on the grounds. Petitioners moved into their new residence on December 4, 1976. At that time the construction was substantially completed; however, the home was not fully furnished; certain floor and carpeting material had been ordered but was not installed; kitchen cabinets had arrived but were not assembled; and certain finish work and wallpapering remained to be performed. In December 1976, Mrs. Manzoli discovered that she had cancer. She received sick leave during 1977 and thereafter resigned from her teaching post. She underwent surgery in December 1977, and received psychiatric treatment as a result of her condition. She also received chemotherapy and radiation treatment in 1978 and 1979. As he was finishing *350 the residence in 1976, Mr. Manzoli began looking for new business opportunities. In October he and Gerald Benjamin (Benjamin) decided to enter the massage parlor business. On November 19, 1976, Mr. Manzoli and Benjamin entered into an agreement for the lease of certain premises in Peabody, Massachusetts. Benjamin provided carpentry services and funds for remodeling the Peabody facility for use as a massage parlor. The business, named the Parisienne Sauna, opened in early January 1977. The massage parlor facility included a sauna, a whirlpool bath, three massage rooms, and a lounge with a television. Shortly after the opening, Benjamin withdrew from the business. By a check dated January 7, 1977, Mr. Manzoli paid Benjamin $ 7,000 for his interest in the business. On February 14, 1977, Mr. Manzoli organized a Massachusetts corporation named Lion Enterprises, Inc., which thereafter operated the Peabody massage parlor. Mr. Manzoli held all of the stock in the corporation. The customers of the Parisienne Sauna paid for a session of masssage in advance by cash, check, or credit card. The desk clerk would fill out a sales ticket showing the customer's name, the masseuse selected *351 by the customer, and the type of session purchased, i.e., a half-hour, an hour, or "Le Baine," described as an hour and 15-minute session including a massage and bath. The masseuses were compensated by the customers' tips and a minimum wage payment from Lion Enterprises. If the tip was charged on a credit card, Mr. Manzoli immediately would pay the tip to the masseuse in cash out of the cash receipts. Mr. Manzoli also used cash from the daily receipts to pay suppliers who did not want to deal with the Parisienne Sauna on a credit basis. Mrs. Manzoli, who was inexperienced with bookkeeping, kept books for Lion Enterprises. She was not involved in the actual day-to-day operations on the business premises. The bookkeeping was done at petitioners' residence. Other than bookkeeping, no activity was carried on at the residence. Generally, Mr. Manzoli delivered the business' cash, customer sales tickets, credit card receipts, and other receipts to Mrs. Manzoli. Mrs. Manzoli made all the bank deposits of cash, checks, and credit card receipts. She disposed of the customer sales tickets without making any record of them. Her system of bookkeeping consisted of spread sheets with *352 multiple columns for categorizing disbursements and another column for recording deposits. On February 1, 1978, at the instance of Mr. Manzoli, a brokerage account was opened with E. F. Hutton in the name of James Spinale. On February 6, 1978, Mrs. Manzoli drew a check for $ 20,000 on a bank account of Lion Enterprises, Inc., payable to herself. She endorsed the check and used the proceeds to purchase three cashier's checks for $ 7,500, $ 7,500, and $ 5,000, all payable to E. F. Hutton. On February 8, 1978, shares of stock were purchased for the Spinale account for $ 45,483.50. As of February 14, 1978, the three cashier's checks were credited to the Spinale account. On his 1978 income tax return, Spinale reported gains and losses from certain transactions conducted through the account; the net result of this reporting was a loss deducted against other income. In March 1978 Mrs. Manzoli signed a purchase contract with Foreign Motors, Inc., for a Mercedes Benz 450SLC. The price was $ 28,605. The Mercedes Benz was purchased in part or in full with undeposited cash of Lion Enterprises. On June 15, 1978, Mr. Manzoli purchased a Rolls Royce Silver Shadow, also in part or in full *353 with cash taken from the receipts of Lion Enterprises. The purchase price was $ 48,000. The automobiles were purchased, registered, and insured in the corporation's name. On September 25, 1978, Harold Sternberg (Sternberg), a long-time friend of Mr. Manzoli, organized a Maine corporation named Lion Industries, Inc., for the purpose of operating a massage parlor in Portland, Maine. All of the stock in the corporation was held by Mrs. Manzoli. Sternberg loaned $ 20,000 in cash to Mr. Manzoli to remodel a location as a massage parlor and for start-up costs. The Portland massage parlor opened in October 1978, and also used the name Parisienne Sauna. The charges and types of sessions were similar to those of the massage parlor in Peabody. Mrs. Manzoli handled the receipts and deposits and maintained records for the Maine parlor in the same manner as she did for the Peabody parlor. After 2 or 3 weeks, Sternberg decided to withdraw from the business for personal reasons. He severed his connection with the business on November 4, 1978, and Mr. Manzoli paid Sternberg $ 10,000 in cash on that date. The remaining $ 10,000 was due to be paid in a few weeks. Sternberg was interviewed *354 by Internal Revenue Service agents on February 5, 1982, and executed an affidavit in which he stated that "Manzoli had definitely settled this obligation by the end of November 1978." In October 1978, Mr. Manzoli hired his brother Bernard Manzoli to manage the Peabody massage parlor. Late in 1978 the facilities in Peabody were expanded. Three massage rooms were added, for a total of six. Two tubs were added, for a total of three. On December 19, 1978, petitioners opened a checking account with E. F. Hutton in the name of Bernard Manzoli. The account card indicated that duplicate statements were to be sent to Mr. Manzoli and showed Mr. Manzoli as a referral. The account was opened with two checks for $ 8,428.54, which were furnished by Mr. Manzoli. In January 1979, the employment relationship between Mr. Manzoli and Bernard Manzoli became strained. Bernard Manzoli quit his employment at the Peabody massage parlor on February 15, 1979. About that time Mr. Manzoli closed the Bernard Manzoli account, receiving a check for $ 17,997.90 drawn by E. F. Hutton made payable to Bernard Manzoli. On February 21, 1979, Mr. Manzoli requested that Bernard Manzoli endorse over the E. F. *355 Hutton check, but he refused. In April 1979 Mr. Manzoli instituted a suit against Bernard Manzoli and E. F. Hutton for payment of the funds represented by the check. In his complaint, Mr. Manzoli asserted in relevant part: 6. In December, 1978, the Plaintiff, for certain business or personal purposes, sought to open a separate account in the name only of another. He then discussed the matter with the Defendant Manzoli, who thereupon stated to him that he would be willing to hold such an account as a nominee for his (the Plaintiff's) benefit. And so, later in that month, in reliance upon such statement, the Plaintiff opened the above described account. The account so remained until February, 1979, when the Plaintiff closed it. 7. During that period, the Plaintiff provided all funds deposited therein which totalled the sum of about $ 17,000. Furthermore, during that period, he exercised absolute management and control thereof. At no time, did the Defendant Manzoli in any manner whatsoever, contribute to, participate in decisions concerning, or inquire about, the account. In fact, at no time did he even execute the required and customary documents or agreements issued by *356 the Defendant Hutton.
The case was settled and dismissed in June 1986. The disputed funds were paid to Bernard Manzoli. Stanley L. Jacobs (Jacobs), a certified public accountant, prepared petitioners' 1977 and 1978 joint income tax returns. Jacobs also prepared the 1978 tax returns of Lion Enterprises and Lion Industries, both as subchapter S corporations. The corporate returns prepared by Jacobs were based on information furnished by Mrs. Manzoli, which included the records of deposits and disbursements and bank statements of deposits. Mrs. Manzoli did not furnish Jacobs any underlying documents or records of the corporations' gross income, such as customer sales slips or credit card receipts. Jacobs computed the gross income of each corporation from the amounts shown as deposits in Mrs. Manzoli's records. The 1978 returns for Lion Enterprises, Lion Industries, and petitioners were filed late on July 2, August 6, and August 13 of 1980, respectively. Lion Enterprises' 1978 return did not report any depreciation, operating expenses, or corporate ownership of the Mercedes Benz or Rolls Royce. On June 13, 1984, the Grand Jury of the United States District Court for the *357 District of Massachusetts indicated Leo T. Manzoli and Mary Ann Manzoli for willfully attempting to evade and defeat their Federal income tax liabilities for the taxable years 1977 and 1978, in violation of section 7201. On January 3, 1985, Mr. Manzoli pled guilty to attempted evasion of income tax for the taxable year 1978. Judgment was entered January 4, 1985. On January 18, 1985, the indictment against Mrs. Manzoli was dismissed. On September 25, 1986, respondent sent a statutory notice of deficiency to petitioners for the taxable years 1977 and 1978, determining understatements of petitioners' taxable income for 1977 and 1978 of $ 47,517.63 and $ 301,315.43, respectively, based on the net worth method of computation. Respondent also determined that all or part of petitioners' underpayment of tax for each year was due to fraud. OPINION I. Underreported Income
The first issue for resolution is whether petitioners underreported their taxable income for each of the years 1977 and 1978. Respondent's determination of unreported income is based on a net worth analysis. The validity of that analysis must be examined by applying the standards set forth in Holland v. United States,348 U.S. 121, 129 (1954), *358 and United States v. Massei,355 U.S. 595 (1958). Under those standards, respondent must establish with reasonable certainty an opening net worth; he must further establish either that a likely source of unreported income existed or that he conducted a reasonable investigation of leads to negate the existence of nontaxable sources of income. As to the deficiency determined (although not with respect to the addition to tax, as discussed below), petitioners must prove that the analysis of respondent is erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure.
Preliminarily, petitioners argue that respondent's reliance on the net worth method was improper. First, petitioners contend that because respondent did not offer in evidence the books and records of petitioners on their corporations, the Court cannot find as a fact that such records were not adequate. Second, petitioners not that Special Agent Matthew Galvin (Galvin), who prepared the net worth schedule which was submitted to the grand jury in the criminal case, testified as a witness in this case, whereas *359 Revenue Agent John Sullivan (Sullivan), who prepared the net worth schedule attached to the deficiency notice, did not testify; further, the net worth statement prepared by Sullivan indicated lesser increases in net worth than the computation prepared by Galvin. Citing Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F.2d 512 (10th Cir. 1947), petitioners thus assert that Sullivan's absence at trial gives rise to the presumption that, had he testified, his testimony would have been unfavorable to respondent's net worth analysis. Third, petitioners contend that respondent's determination of net worth is inaccurate, arbitrary and capricious. Respondent's use of the net worth method in this case has not been discredited. The evidence establishes unreliability of Lion Enterprises' books. Mrs. Manzoli's system of bookkeeping with regard to gross sales was based merely on daily deposits, not individual sales transactions, and Mr. Manzoli diverted corporate cash that was never deposited to the corporation's bank account. In any event, the application of the net worth method does not require a preliminary showing that the *360 taxpayer's records are inadequate. Petitioners' counsel acknowledged in his opening statement "that the courts have held that whether the taxpayer has excellent books and records, or no books and records, that [respondent] can use the net worth system." Specifically, it has been said: The fact that the taxpayer's books and other records are consistent with his income tax returns or are internally consistent proves nothing more than that they are consistent; it does not establish that they are truthful or accurate. See Holland v. United States,348 U.S. at pages 131-132, * * *. In short, the apparent adequacy of the taxpayer's books is the very thing that the net worth method attacks by independently demonstrating the receipt of unrecorded and unreported taxable income. * * *
Davis v. Commissioner,239 F.2d 187, 189 (7th Cir. 1956), affg. a Memorandum Opinion of this Court. To require the Commissioner to produce a taxpayer's books for purposes of establishing their inadequacy would practically encourage taxpayers to destroy or conceal such records. Petitioners admitted destruction of the sales slips that would have shown their gross *361 receipts. Special Agent Galvin did not testify to explain the net worth analysis; the analysis and petitioners' contrary analysis were the subject of stipulation. Galvin testified about inconsistent statements of petitioners and their witnesses. If petitioners believed that Sullivan would have presented testimony favorable to their case, they could have secured his appearance. Respondent had no duty to present documentary evidence or oral testimony unless he relied on it to establish an element of his fraud claim. The circumstances of this case do not justify a negative inference from nonproduction. See Gafford v. Trans-Texas Airways,299 F.2d 60, 63 (6th Cir. 1962); see generally 2 Wigmore on Evidence section 287 (Chadbourn rev. 1979). Petitioners next challenge the accuracy of respondent's net worth computation in three general, although often intertwining, areas: (a) cash on hand, (b) miscellaneous assets and liabilities, and (c) certain nondeductible expenditures.
(a) Cash on hand
Petitioners dispute respondent's determination of the amount of cash on hand and undeposited in banks for December 31 of 1976, 1977, and 1978. The chief point of *362 dispute is the correct amount of cash on hand and undeposited in banks as of December 31, 1976, which petitioners argue was at least $ 200,000, rather than $ 23,629.54 as determined by respondent. Petitioners contend that the total sum consisted of the following amounts of cash obtained from the following sources: (1) $ 20,000, which Mrs. Manzoli had saved from her jobs before marriage; (2) $ 25,000, which Mrs. Manzoli had saved from his jobs before marriage; (3) $ 7,000, which Mr. Manzoli received as settlement for a case involving a 1957 personal injury; (4) $ 20,000, which Mr. Manzoli received at marriage from a trust funded by the estate of his uncle Alfonso Manzoli; (5) $ 15,000, from wedding gifts; (6) $ 40,000 which the petitioners had saved from their jobs subsequent to their marriage; (7) $ 30,000, representing the balance of a loan for $ 50,000 from Spinale to petitioners for their investment in the Clock Restaurant; (8) $ 30,000, which Spinale loaned petitioners during 1976 when they were building their house; (9) $ 15,000, which was loaned to petitioners in the latter part of 1976 by Mrs. Manzoli's uncle, Joseph Ortisi; (10) $ 5,000 in cash received *363 by petitioners as Christmas gifts from Spinale prior to December 31, 1976 (generally, $ 200 to Mrs. Manzoli each year and $ 200 to Mr. Manzoli each year since marriage).
As for their motivation for hoarding cash, petitioners contend that they constructed their new residence during 1976, 1977, and 1978; that the residence was planned and begun before they entered into the massage parlor business; that they had providently accumulated sufficient funds to complete the residence before the massage parlor was begun; and that all of those funds were held by petitioners as of December 31, 1976, in cash, and not reflected otherwise in any assets or accounts in the net worth computation. Petitioners also contend that they chose to hold undeposited cash because of a lack of confidence in financial institutions. The only direct evidence that petitioners present in support of their argument is Mrs. Manzoli's unpersuasive, generalized testimony that petitioners had approximately $ 195,000 in cash on hand as of December 31, 1976. Neither Mr. Manzoli nor any other witness for petitioners testified as to the amount of petitioners' cash hoard. The real evidentiary pillar of petitioners' argument *364 is the testimony of petitioners and their witnesses concerning petitioners' capacity, desire, and purpose for hoarding cash in the alleged amount. For the reasons set forth below, Mrs. Manzoli's testimony on the amount of petitioners' cash hoard is unacceptable. The allegedly corroborative testimony is vague, unpersuasive, or contradicted by prior statements, and cannot be the basis of findings as to the actual amount of cash on hand. We are not persuaded that petitioners saved or obtained cash from the identified sources in the amounts which they allege. With regard to the amounts of cash petitioners had on hand attributable to the period before November 1973 (Items 1 through 5, possibly 6 and 7, above), petitioners urge us to believe that they had $ 87,000 plus perhaps the $ 30,000 balance of the restaurant loan and a portion of the $ 40,000 saved from earnings after their marriage. This is contradicted, however, by petitioners' personal financial statement, dated November 7, 1973. The financial statement, which was "puffed" in at least one respect, indicates total cash of $ 55,000, of which $ 29,000 was deposited in banks. In their brief, petitioners assert that the category *365 "cash on hand, and unrestricted in banks" did not include cash in strongboxes at their residence. This claim is illogical, incredible and borders on frivolity. The financial statement is an admission, therefore, of the maximum amount of cash on hand as of its date, and we cannot conclude that an additional $ 140,000 or more was accumulated in the succeeding 3 years. Petitioners presented no records, instruments, or other documentary evidence with regard to any of the alleged "loans" or receipts of money. As to the amounts of loans, particularly those made by Spinale, the record is muddled by a series of inconsistent statements made by petitioners and certain witnesses before and during the trial. When Galvin interviewed Spinale regarding loans to petitioners to participate in the Clock Restaurant investment, Spinale denied ever having made any loans. (Item 7) At trial Spinale claimed that he clearly recalled lending petitioners $ 29,000 to purchase land on which they built their residence, a loan not at issue here, but his testimony was vague and inconclusive as to the amount of loans for the construction of the residence. Even if we accepted petitioners' contention that they *366 saved or received cash in the amounts alleged above, we are not persuaded that petitioners personally held, rather than deposited, invested, or expended, such cash as of December 31, 1976. Petitioners' borrowing of money indicates the absence, rather than the presence, of a large accumulation of cash. Thomas v. Commissioner,223 F.2d 83, 88 (6th Cir. 1955). Assuming, as petitioners contend, that they accumulated cash for the purpose of financing the construction of their residence, the majority of the construction was completed by December 1976, and petitioners' cash on hand would have been substantially depleted by that time. Further, petitioners' contention that they hoarded cash because of a lack of confidence in financial institutions is not persuasive, particularly in view of their extensive use of bank and brokerage accounts. We concluded that petitioners have failed to prove that the amount of their cash on hand and undeposited in banks as of December 31, 1976, was any more than that determined by respondent. Petitioners argue that their cash on hand as of December 31, 1977, was $ 144,300, which follows from their computation regarding cash on hand for *367 the closing of 1976. Thus both contentions must be rejected together. Petitioners argue that their cash on hand on December 31, 1978, was $ 10,000, rather than $ 27,997 as determined by respondent. The critical question here is whether the $ 17,997 E. F. Hutton checking account balance in the name of "Bernard Manzoli" was an asset of petitioners. For the reasons cited below, we conclude that it was.
(b) Miscellaneous assets and liabilities
The second area of dispute concerns whether petitioners held an interest in the Mercedes Benz, the Rolls Royce and certain E. F. Hutton accounts on December 31, 1978, and whether respondent correctly determined the amount of petitioners' liabilities to Spinale and Sternberg. Petitioners argue that the Mercedes Benz and Rolls Royce were owned by Lion Enterprises, not by themselves personally, and thus the value of the automobiles should not be included in the 1978 closing balance of their net worth. In support of their argument, petitioners point out that the certificate of title, registration, bill of sale, and sales tax receipt of each car reflect ownership by Lion Enterprises. *368 Title and the attendant documents which reflect title are not conclusive of ownership. Title and beneficial ownership are often split, and taxation is more concerned with actual command over the property and the assumption of burdens and benefits of ownership than with formalities of ownership. Griffiths v. Helvering,308 U.S. 355, 357 (1939). In view of all of the evidence, we are not satisfied that Lion Enterprises was the beneficial owner of either automobile. Except for certain vague testimony that Mrs. Manzoli used the Mercedes Benz for running errands for the corporation, the record does not reveal a business purpose for either automobile. Lion Enterprises' 1978 corporate tax return did not report corporate ownership of either automobile, depreciation, or operating expenses. The evidence does not establish the extent to which corporate funds were used to purchase the automobiles. When asked at trial about the source of cash used to purchase each automobile, Mr. Manzoli testified that the money came from petitioners' personal cash hoard as well as from undeposited cash of the corporation. Even if we accepted petitioners' argument that the automobiles were *369 owned during 1978 by the corporation, they would be part of the corporate net worth -- representing unreported income of the subchapter S corporation -- and therefore would increase petitioners' net worth. Petitioners also dispute respondent's determination that two E. F. Hutton accounts opened in 1978 -- the "Bernard Manzoli" account and the "James Spinale" account -- were nominee accounts actually owned and controlled by petitioners. We are persuaded that petitioners' net worth included the "Bernard Manzoli" checking account in 1978. The evidence indicates that Mr. Manzoli opened and funded the account and intended to retain absolute ownership and control over the account, at least through the years in issue. His 1979 complaint against his brother contains admissions fatal to his present claim. We are not persuaded otherwise by the settlement of Mr. Manzoli's suit against Bernard Manzoli over the proceeds of the account in favor of the latter, which occurred in 1986. We are persuaded, however, that the James Spinale brokerage account belonged to Spinale. Although petitioners provided at least part of the funds in the account, they satisfactorily explained that they established *370 the account to help Spinale, who had financially assisted them in previous years. Spinale exercised control over the account during 1978, and he reported gains and losses attributable to the account on his 1978 income tax return. Alternatively, respondent asserts in his brief that all of the funds credited to the account during 1978 -- $ 56,810 -- were provided by petitioners and thus should be considered a nondeductible expenditure. We decline to accept this argument because (1) it is untimely, and (2) if, as petitioners suggest, the account was set up to "repay" a debt to Spinale, the repayment might have been offset against loans in excess of those determined by respondent. As discussed below, we do not make an affirmative finding as to the total liabilities outstanding at any time. We merely sustain respondent's determination because of petitioners' failure to prove that it is erroneous. With regard to liabilities, respondent determined petitioners' liability to Spinale at the close of 1976, 1977, and 1978 to be $ 30,000 for each year, reflecting the loan Spinale made to petitioners for the purchase of land on which they built their house. Petitioners argue that this *371 figure should be increased by $ 79,000 for each of the 3 years to reflect loans made for petitioners' Clock Restaurant investment and the construction of their home. We sustain respondent's determination. The record is unclear as to the amounts of cash Spinale advanced to petitioners, as previously discussed, and inadequate to prove that any advances were provided with the intent to create an indebtedness. We cannot base any findings of the amount of debts on such unsatisfactory evidence. Petitioners also dispute respondent's determination that they had fully satisfied the $ 20,000 Sternberg loan as of the end of 1978, which was based on Sternberg's sworn statement of February 5, 1982, that "Manzoli had definitely settled this obligation by the end of November 1978." Petitioners contend that the loan was still outstanding at that time to the extent of $ 10,000. In support of their contention, petitioners rely upon the trial testimony of Sternberg to the effect that the loan possibly was repaid at the beginning of 1979 or "give or take a few months" of November 1978, explaining "the exact time he paid it I don't recall." This testimony establishes nothing and cannot satisfy petitioners' *372 burden of proof.
(c) Nondeductible expenditures
Petitioners assert that respondent was erroneous in determining the following expenditures to be nondeductible, contending that each was incurred in the course of business or by someone other than petitioners: (1) $ 4,700 in 1978 paid to Hallmark Furniture for furniture; (2) $ 801 in 1977 and $ 2,270 in 1978 paid to Reliance Insurance Co. for automobile insurance; (3) $ 1,119 in 1978 paid to Foreign Motors, Inc.; (4) $ 1,427 in 1977 and $ 3,682 in 1978 paid to James Corkery for electrical work; and (5) $ 725 in 1977 paid to Sacco Title for tile installation. We cannot accept petitioners' contention regarding the Hallmark Furniture expenditure, because it is not satisfactorily explained by their testimony at trial. In response to leading questions, Mr. Manzoli testified that certain unidentified employees of Lion Enterprises purchased and paid for the furniture under the corporation's name for the purpose of getting Lion Enterprises' corporate discount. Mrs. Manzoli's testimony, also in response to leading questions, was simply that "it was somebody else's purchase." This testimony is unpersuasive. Nor can we *373 accept petitioners' contentions regarding the Reliance Insurance Co. and Foreign Motors, Inc., expenditures. Petitioners' evidence regarding the former is insurance premium billings for Rolls Royce, the Mercedes Benz, and a Lincoln Continental owned by petitioners. Petitioners' evidence regarding the latter consists of two checks drawn on petitioners' personal checking account to Foreign Motors, Inc. As indicated above, petitioner have not established that the automobiles were used for business purposes; without more evidence, we cannot find expenditures incurred for their operation deductible. Further, petitioner neglected to provide any evidence concerning the purpose of the payments to Foreign Motors, Inc. With regard to the expenditures to James Corkery and Sacco Tile, petitioners presented evidence of checks drawn on Lion Enterprises' account in at least the amounts in dispute and Mrs. Manzoli's uncontradicted testimony that the checks were paid for work performed for Lion Enterprises. Considering the extensive remodeling of the Peabody facility during its first two years of operations, her testimony on this item is credible. We thus agree with petitioners' contentions *374 on these matters to the extent of $ 1,427 plus $ 725 in 1977 and $ 3,682 in 1978. Petitioners have not shown any other errors in respondent's net worth analysis, and respondent's determination, as adjusted for the foregoing items and concessions made by respondent, must be sustained. II. Additions to Tax for Fraud
The parties agree that Mr. Manzoli is estopped from denying fraud for 1978 because of his plea of guilty to criminal tax evasion for that year. See Rodney v. Commissioner,53 T.C. 287 (1969); Artic Ice Cream Co. v. Commissioner,43 T.C. 68 (1964). The issues then are whether additions to the tax for fraud should be imposed on Mr. Manzoli for 1977 and on Mrs. Manzoli for 1977 and/or 1978. The 50-percent addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell,303 U.S. 391, 401 (1938). Respondent has the *375 burden of proving, by clear and convincing evidence, for each year, an underpayment of tax, and that some part of the underpayment was due to fraud. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 190 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayers' entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). *376 Respondent urges that the addition to tax for fraud be imposed upon each petitioner for each year. In support of his argument, respondent asserts that petitioners knowingly understated their income, as follows. First, petitioners' subchapter S corporation failed to report large amounts of income generated from cash transactions as a result of income generated from cash transactions as a result of Mr. Manzoli's diversion of undeposited cash. Second, petitioners failed to report any gain on the sale of Mr. Manzoli's Clock Restaurant interest, either in 1975 or as the installments on the buyer's note were paid, and failed to report interest income from the note during 1977 and 1978. Third, petitioner failed to report $ 1,705 in dividend income earned in 1977 on a joint brokerage account. Fourth, petitioners overstated a long-term capital loss for 1977 in the amount of $ 16,950.90. Fifth, neither petitioners nor Lion Enterprises reported income earned by the massage parlor between its commencement of business in January 1977 and its incorporation on February 14, 1977. Respondent further contends that petitioners' fraudulent conduct is reflected by their destruction of certain records *377 and their inconsistent statements made during the Internal Revenue Service investigation and the trial. After careful consideration of all of the evidence, we conclude that respondent has failed to meet his burden of proving by clear and convincing evidence that petitioners fraudulently underpaid their taxes for either year. Although we sustained to a large extent respondent's determination of petitioners' underreported income, we did so because his determination was not shown to be erroneous. The evidence is not clear and convincing, however, of fraudulent intent. With regard to respondent's assertion that Mr. Manzoli distorted Lion Enterprises' records of income by diverting undeposited cash, the evidence proves only that Mr. Manzoli diverted undeposited cash in 1977 for the payment of certain expenditures relating to the business and for customer tips charged by credit card. Mr. Manzoli's withdrawal of cash from the daily cash receipts to pay masseuses for tips charged on credit card receipts may have resulted in an understatement of cash receipts and an overstatement of credit card receipts, but it would not necessarily have resulted in an understatement of the business' *378 income. The evidence is not clear and convincing that the diversions of cash were substantial, or that Mrs. Manzoli was aware of any fraudulent diversions of cash. As indicated above, Mr. Manzoli testified that the purchase money for the automobiles was in part from petitioners' personal cash and from Lion Enterprises' undeposited cash receipts. We are not convinced that Mrs. Manzoli had an intent to conceal, mislead, or otherwise prevent the collection of taxes for the years in issue. The failure to keep records or to assure correct tax reporting could too easily be attributed to her medical problems or inexperience with bookkeeping. We give little weight to respondent's assertion that petitioners failed to report gains from the sale of the Clock Restaurant interest, for record is not clear as to Mr. Manzoli's basis in the interest or that a gain was actually realized. Petitioners' failure to report certain interest and dividend income and income generated by the massage parlor during its first few weeks of operation, and petitioners' overstatemnet of a long-term capital loss, may also be explained as demonstrating only extreme negligence. We are not satisfied that in this *379 case the omissions establish fraudulent intent. We do not intend by this opinion to vindicate petitioners. Their testimony at trial was unpersuasive, although not demonstrably false. Their destruction of records, certain inconsistent statements, and the various items of underreporting are troublesome and suspicious. Most of their arguments are totally unsupported by the evidence. Suspicion, alone, however is not a sufficient basis for determination of fraud. See, e.g., Katz v. Commissioner, 90 T.C.     (June 15, 1988). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect during the years in issue, except as otherwise noted. ↩
2. The addition to tax for the taxable year 1978 was computed on the total tax for that year, rather than on the deficiency, because the return was filed late. See section 6653(c)(1)↩.